KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> RON K. HARRISON; AND GLOBAL TRADING INSTITUTE, LLC, <br><br> Defendants, <br><br> and <br><br> IRINA PARFYONOVA, <br><br> Relief Defendant. | Case No. <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The SEC brings this emergency action pursuant to authority conferred on it by Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(b), Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d) and 78u(e), and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-9(d), to restrain and enjoin the Defendants Ron K. Harrison ("Harrison") and Global Trading Institute, LLC ("GTI") (collectively "Defendants") from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.

2. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e), and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14.

3. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

4. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14 because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Harrison resides in this district and Defendant GTI has its principal place of business in this district.

///

# SUMMARY

5. Harrison, an Orange County based unregistered investment adviser and his companies Global Trading Institute, LLC ("GTI") and the now defunct Trading Advisement Program, LLC ("TAP") have been conducting an ongoing investment advisory fraud since 2016.

6. From at least 2016 through August of 2021 Harrison, who has been barred by the Financial Industry Regulatory Authority ("FINRA") from affiliating with any member brokerage firm, has been acting as an unregistered investment adviser and trading options in his clients' online brokerage accounts.

7. Through at least June of 2021, Harrison sent his clients monthly invoices misrepresenting the purported gains from his trading in the clients' accounts in order to collect an improper performance fee from them based on the overstated gains.

8. From 2016 through the present, Harrison's clients have suffered net combined losses of over $2 million from Harrison's trading. Despite these losses to his clients, Harrison has collected over $900,000 in fees from them.

9. Since June 2018, Harrison has transferred $279,365 in funds he received from his clients to his girlfriend, Irina Parfyonova ("Parfyonova" or "Relief Defendant"), which she largely used to pay for their joint living expenses.

10. Harrison also defrauded his clients and prospective clients by touting his experience as a "Wall Street" trader but not disclosing that FINRA barred him from the securities industry for misappropriating money from customers and engaging in unauthorized trading in his customers' accounts.

11. As a result of the conduct alleged in this Complaint, Defendants violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 17j(b), Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act. Unless restrained and enjoined, Defendants will engage in future violations of the federal securities laws.

12. The SEC seeks jointly and severally from Harrison and Parfyonova

disgorgement of each party's ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon, disgorgement from GTI of ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon, and against the Defendants and Relief Defendant an emergency asset freeze, accounting and document preservation order, as well as against the Defendants permanent injunctions, and civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## DEFENDANTS

13. **Ron K. Harrison ("Harrison")**, age 69 is a resident of Ladera Ranch, California. From early 1988 to early 1990, Harrison held Series 7 and 63 securities licenses and was affiliated with various registered broker-dealers. In June 1992, FINRA found that Harrison had misappropriated $62,500 from customers, engaged in unauthorized trading in customer accounts, and failed to respond to FINRA's requests for information. FINRA barred Harrison from affiliating with any member firm, and ordered Harrison to pay $57,000 to customers and a $75,000 fine. *See* https://files.brokercheck.finra.org/individual/individual_1785805.pdf. Harrison has never been registered with the SEC in any capacity.

14. **Global Trading Institute, LLC ("GTI")** is an Arizona company that Harrison formed in May 2015 and currently has its principal place of business in Orange County, California. Harrison controls GTI. GTI has never been registered with the SEC in any capacity.

## RELIEF DEFENDANT

15. **Irina Parfyonova** ("Parfyonova"), age 48, is a resident of Ladera Ranch, California. She has been Harrison's girlfriend since late 2017 and has resided with him since mid-2018.

///

///

3

# RELATED PERSONS

16. **Traders Advisement Program, LLC aka Traders Advisory Program, LLC ("TAP")** was a Nevada company from January 2016 to February 2019, when Nevada revoked its status as a limited liability company. During its existence, TAP was controlled by Harrison. Even though TAP's status as a limited liability company was revoked, Harrison has continued to do business as TAP. TAP was never registered with the SEC in any capacity.

# THE FRAUD

### A. Defendants Attract Clients through Online Options Trading Courses but Conceal Harrison' Securities' Industry Bar

17. Beginning in at least 2016 through June 2019, Harrison, through GTI, offered various courses to investors on options trading.

18. GTI operated a now defunct website at www.GlobalTradingInstitute.com.

19. On the GTI website, Harrison offered webinars that investors could sign up for, such as "The Secrets to Profit the Big Brokerage Firms don't want you to know."

20. Defendants also offered "live courses" to clients, including a three day course offered October through December 2015, named "Optioneering for Income Live Course."

21. In addition, Harrison posted videos to social media under GTI's social media name. For example, on or about April 18, 2017, Harrison posted a video of himself titled "Top 6 Reasons to Trade Futures." On or about February 3, 2017, Harrison posted a video of himself titled "Top 5 Reasons to Trade Forex."

22. Beginning in or around mid-2019, Harrison began offering the same online courses under the name "The Other Side of Wall Street." The website for The Other Side of Wall Street similarly stated that the courses teach investors a "systematic strategy" for options trading that reduces risk and increases profits,

regardless whether the market goes up, goes down, or stays flat."

23. Once a potential client found Defendants' courses or website and provided his or her email address, Harrison would send that person marketing emails from his email address at info@globaltradinginstitute.com, listing himself as the CEO of GTI.

24. GTI's email advertisements for the courses stated that Harrison would "reveal 'the secret' trading method" he had "learned as an institutional Trader on Wall Street." According to the advertisements, the secret trading method is how Wall Street "[f]irms trade their own money to make billions for themselves (at least 5% per month!!!!!), but they don't trade *your* money this way."

25. The email advertisements stated Harrison had "taught hundreds of students the very same method" and that they "are creating monthly returns beyond your wildest imagination."

26. The email advertisements also assured investors that they could "make more profit with less risk" and "make money in the market whether it is going up, going down or staying flat."

27. Harrison also offered to clients to join GTI's "Trading Tribe" on Facebook for "real-time updates & tips" concerning the trading programs he offered.

28. Harrison verbally offered to course attendees that he would trade options in their brokerage accounts in exchange for 15% of any new trading profits.

29. From 2016 to the present, at least 22 people agreed to Harrison's offer to trade in their accounts. There was no written agreement between Harrison and his clients.

30. Several of Harrison's clients were retired senior citizens who had little or no experience in trading securities.

31. Harrison never disclosed to his clients that his securities trading experience consisted of working at several brokerage firms for only two years, and that, in 1992, FINRA barred him from the securities industry for misappropriating

money from customers and engaging in unauthorized trading in their accounts.

32. For example, in or about August to October of 2015 and in or about April and May of 2016 a prospective client and her husband attended seminars conducted by Harrison on options trading. At no time during those seminars or after did Harrison disclose to this prospective client that FINRA had barred him from associating with any member brokerage firm for misappropriating money from a customer and engaging in unauthorized trading in a customer's account. This couple ultimately became Harrison's clients and authorized him to trade in their brokerage accounts in exchange for 15% of any new trading gains in the accounts. Had these clients known of Harrison's disciplinary history, they would not have given Harrison access to trade in their brokerage accounts.

33. Harrison, as GTI's sole control person, had ultimate authority over the substance of the omissions concerning his disciplinary history on the email advertisements for GTI's trading classes.

34. GTI's advertising touting Harrison's experience as a Wall Street trader without disclosing Harrison's prior disciplinary history with FINRA is a material omission. A reasonable investor would have wanted to know about Harrison's disciplinary history in order to assess his veracity and whether the business he was involved in was legitimate and sound.

**B.  Harrison Trades in Client Accounts**

35. The clients gave Harrison access to their brokerage accounts by providing him with their accounts' online usernames and passwords.

36. Harrison then used the clients' credentials to log on to their accounts and engage in significant options trading.

37. Since March 2016, Harrison's trading resulted in large losses to the clients. Of his 22 clients, 19 suffered trading losses totaling almost $2.1 million, and only three clients had trading profits totaling $81,000.

///

### C. Defendants' False Invoices and Inflated Fees

38. From at least January 2016 through June 2019, Harrison, directly or through TAP or GTI, issued fee invoices to clients. The type of information provided in the invoices varied among the clients and over time.

39. The invoices described Harrison's services as "Trading Advisement" and/or "Account Gains." All invoices stated the fee owed for the month.

40. Many of the invoices also provided the calculation of Harrison's fee by stating the client's purported gains, the 15% fee, and the resulting fee amount. Some of the invoices also stated the client's "total balance" or "total cash and sweep balance" from the trading.

41. For example, on or about November 19, 2018, Harrison, through GTI, sent an invoice to a client claiming "Oct Trading Account Gains" and billing the client $240.04 for that month. In reality, in October of 2018 this client's account actually lost $7,166.92 in value.

42. Similarly, on or about August 17, 2019, Harrison sent an invoice claiming gains in the amount of $36,184.75 to a client claiming account gains for the month of July 2019 across two accounts. In this invoice, Harrison billed this client a 15% fee of $5,427.72. In reality, in July 2019, this client's two accounts actually lost a combined $5,586.08.

43. On or about November 19, 2018, Harrison, through TAP, sent an invoice to another client in the amount of $2,315 claiming October 2018 account gains of $15,433.36. In fact, in October of 2018, this client's account actually lost $38,602.13.

44. From January 2016 through June 2021, Harrison collected from his clients at least $928,000 in performance fees. His clients paid him by check and through payment processors PayPal and Wave Financial. The clients' checks were made payable to TAP and deposited into its bank account. The payment processing accounts that received client fees were in the name of TAP and GTI. Harrison used

7

these bank and payment processing accounts to pay his personal expenses.

45. Harrison's invoices, however, generally substantially overstated the performance fees he was due. For example, for the period from January 2016 through June 2021, based on his clients' actual profits, Harrison was only entitled to $53,290 in fees, not $928,000 that he collected.

46. In addition to the performance fees he charged clients, Harrison also collected about $54,600 in alleged "management fees" from six clients in March 2018.

47. Harrison's invoices to at least some clients were misleading in that they reflected only the accounts' increased *cash* positions and ignored the accounts' options trading and positions, which had a negative effect on the accounts' performance and net balances. For example, for May 2021, Harrison's invoice to one client reported "Gains" totaling $84,749 and "total Cash and Sweep" balances totaling $2.9 million. Indeed, that month the cash in that client's accounts had increased by $84,749 and had cash balances totaling $2.9 million. The cash increases, however, are not truly "Gains," as represented in the invoices. Instead, the cash increases are generated through Harrison's manipulation of the cash positions by selling more options than he buys. In fact, after accounting for the accounts' net realized and unrealized losses from the options trading and positions, these accounts actually lost $18,567 and had net balances totaling only $353,628.

48. Harrison's clients trusted and relied on Harrison to trade securities in their brokerage accounts and to provide information to them about the trading.

49. When pressed by a client about why her account was not showing a profit despite paying thousands of dollars of fees to Harrison, Harrison blamed outside market forces and never explained how his commissions were justified. For example, on or about August 29, 2019 a client emailed Harrison at his GTI email address, stating that the "agreement was that I paid you a 15% fee on money earned in my account" and that "[y]ou billed me a total of $5634.79 over the course of a

year. This would indicate that my account had earned money of $37,565 . . . Where is the $37k that my account supposedly made, that you charged me 15% on??" That same day, Harrison responded to the clients' email claiming that "market turbulence" caused by "Trumps trade war" had negatively impacted the accounts, and that "[t]his is a temporary thing and will get resolved."

50. On or about September 5, 2019, the same client emailed Harrison again, stating "I pay you 15% on income (cash in the account), not for outstanding trades to may or may not expire out of the money … It really doesn't make any sense. Do you have a report to show me the income generated and the 15% I paid you?" A day later, Harrison responded and made excuses blaming the trade war in China, but never explained how his fees were justified.

51. The false and misleading statements about how investors' accounts were performing were on invoices issued by Harrison, GTI, and TAP.

52. Harrison, as GTI's sole control person, had ultimate authority over the substance of the false statements on the invoices.

53. Defendants' false and misleading claims about alleged profits in client accounts on the fraudulent invoices are material. A reasonable investor would have considered it important to know that she was not actually obtaining the profits in her account that her investment adviser claimed she was earning.

**D.  Harrison and Parfyonova Use Client Funds for Personal Expenses**

54. Since at least March of 2018, Harrison has transferred at least $279,365 in illicitly obtained fees received from clients to his girlfriend Parfyonova's account.

55. Parfyonova used these funds to pay her and Harrison's joint living expenses, including rent, utilities, food, cell phones, clothes, dining, and entertainment.

///
///
///

9

### E. Harrison Continues to Trade in Client Accounts after Brokerage Closes Client Accounts

56. Since August 2020, Harrison has had at least three clients, including a married couple with three Harrison-managed accounts, and one additional client, who has one Harrison-managed account.

57. Harrison has caused these three remaining clients to suffer significant trading losses but is still collecting substantial improper fees from them. For example, in the five months from February through June 2021, Harrison has collected fees totaling $110,000 from these clients despite his trading causing them to suffer total net losses of over $236,000.

58. The clients have paid Harrison's fees through TAP's PayPal account. Harrison transferred much of those fees to GTI's PayPal account and used the money from both accounts to pay his personal expenses.

59. On or about July 16, 2021, the remaining three clients' brokerage firm notified the clients that it had determined to close their accounts. It also notified the clients that their accounts would be liquidated and proceeds sent to them if their accounts were not transferred to another brokerage firm within a month and that, in the meantime, their accounts were limited to liquidating transactions.

60. All three clients transferred their accounts to a new brokerage firm.

61. The trading patterns in two of the remaining three client accounts at the new brokerage are consistent with Harrison's previous options trading on behalf of his clients. For example, from July 29, 2021 to August 18, 2021, the husband and wife client's brokerage accounts traded approximately $63 million in options.

### F. Defendants Acted with a High Level of Scienter, or in the Alternative, Were Negligent

62. Harrison acted with a high level of scienter.

63. Harrison knew, or acted recklessly in not knowing, that the representations he made to his clients about gains in their accounts and the resulting

1 | fees he charged them were materially false and misleading.

2 |     64.    Harrison knew, or acted recklessly in not knowing, that he was employed by a brokerage firm for only two years and that he was barred from the securities industry. Despite such knowledge, Harrison touted to his clients and prospective clients his experience as a Wall Street trader but failed to disclose his serious disciplinary history.

    65.    In addition, Harrison's conduct was negligent. Harrison's conduct in making representations to his clients about gains in their accounts to justify the fees he charged them, as well as touting his experience as a Wall Street trader but failing to disclose his disciplinary history is a departure from the ordinary standard of care of an investment adviser.

    66.    Harrison's state of mind is imputed to GTI because he controls it.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against all Defendants)**

    67.    The SEC realleges and incorporates by reference paragraphs 1 through 66 above.

    68.    As set forth above, Defendants Harrison and GTI, acting with scienter, made false and misleading statements of material fact about Harrison's trading results and trading experience, and omitted material information about Harrison's trading experience.

    69.    In addition, Defendants Harrison and GTI engaged in a scheme to defraud whereby Harrison created phony invoices for his clients based on misleading statements about how those clients' accounts were performing and concealed information from his clients regarding his securities industry disciplinary history.

    70.    By engaging in the conduct described above, Defendants Harrison and GTI, directly or indirectly, in connection with the purchase or sale of a security, and

by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

71. By engaging in the conduct described above, Defendants Harrison and GTI violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

### (against All Defendants)

72. The SEC realleges and incorporates by reference paragraphs 1 through 66 above.

73. By engaging in the conduct described above, Defendants Harrison and GTI obtained money or property by means of false and misleading statements of material fact about Harrison's trading results and trading experience, and omitting material information about Harrison's trading experience.

74. In addition, Defendants Harrison and GTI engaged in a scheme to defraud whereby Harrison created phony invoices for his clients based on misleading statements about how those clients' accounts were performing and concealed information from his clients regarding his securities industry disciplinary history.

75. By engaging in the conduct described above, Defendants Harrison and GTI, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of

the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

76. Defendants Harrison and GTI, with scienter, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. In the alternative, Defendants Harrison and GTI were negligent.

77. By engaging in the conduct described above, Defendants Harrison and GTI violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (against All Defendants)

78. The SEC realleges and incorporates by reference paragraphs 1 through 66 above.

79. Defendants Harrison and GTI, acting as investment advisers, breached their fiduciary duty to and deceived their advisory clients/ investors. Defendant Harrison created phony invoices for his clients based on misleading statements about how those clients' accounts were performing and concealed information from his clients regarding his securities industry disciplinary history.

80. By engaging in the conduct described above, Defendants Harrison and GTI, and each of them, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) employed or are employing devices,

13

1 schemes or artifices to defraud clients or prospective clients; and engaged in or are
2 engaging in transactions, practices, or courses of business which operated as a fraud
3 or deceit upon clients or prospective clients.

4     81.    Defendant Harrison and GTI, with scienter, employed or are employing
5 devices, schemes or artifices to defraud clients or prospective clients; and with
6 scienter or negligence, engaged in or are engaging in transactions, practices, or
7 courses of business which operated as a fraud or deceit upon clients or prospective
8 clients.

9     82.    By engaging in the conduct described above, Defendants Harrison and
10 GTI have violated, and unless restrained and enjoined will continue to violate,
11 Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Enter a temporary restraining order and preliminary injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, freezing assets, requiring an accounting, prohibiting destruction of documents, and an order to show cause why the asset freeze should not continue until this matter is determined on the merits.

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange

Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

### IV.

Order Defendants Harrison and GTI and Relief Defendant Parfyonova to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7), 15 U.S.C. §§ 78u(d)(5) and 78u(d)(7).

### VI.

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

### VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 30, 2021

/s/ Kathryn C. Wanner
Kathryn C. Wanner
Kelly Bowers
Attorneys for Plaintiff
Securities and Exchange Commission